UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10998-RGS

TARA MULKERRON

v.

MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY

MEMORANDUM AND ORDER ON
APPELLANT'S MOTION TO REVERSE
AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

July 15, 2010

STEARNS, D.J.

Appellant Tara Mulkerron seeks review of the final decision of the Commissioner of the Social Security Administration (SSA), adopting an Administrative Law Judge's (ALJ) decision that she is not disabled. Mulkerron contends that the ALJ's conclusion that her testimony concerning her disabilities was "largely" not credible – is inconsistent with both her documented life activities and the medical evidence in the record – and is therefore not supported by substantial evidence. She also argues that the ALJ erred in giving greater weight to the opinion of a Disability Determination Services (DDS) physician than to the opinion of (at least one of) her treating physicians. The appeal is brought pursuant to 42 U.S.C. § 405(g). The Commissioner cross-moves for an order affirming the ALJ's decision.

BACKGROUND

Administrative Proceedings

Mulkerron applied for Social Security Disability Insurance (SSDI) benefits and Supplemental Social Security Income (SSI) benefits on May 17, 2007. She claims permanent disability as of January 15, 2003, attributable to a panic attack disorder, bipolar disorder, a seizure disorder, and asthma. Trial Record (Tr.) at 118-119. On November 26, 2007, the SSA denied Mulkerron's initial claim, citing her drug addiction as rendering her ineligible for disability benefits as a matter of law. See 20 C.F.R. §§ 404.1535-1536. Mulkerron's claim was denied again on June 20, 2008, after she brought an internal administrative appeal. Tr. at 64-66.

On December 15, 2008, ALJ Alan Mackay heard testimony from Mulkerron, Mulkerron's mother (Kathleen Mulkerron), and Kathleen Bier, a vocational expert (VE). Judge Mackay issued his decision on January 12, 2009. He found that Mulkerron has the residual functional capacity (RFC) to perform a full range of work at all exertional levels with the following non-exertional limitations: (1) frequent inability to understand, remember, and carry out complex or detailed instructions; (2) minimal contact with the general public; and (3) avoidance of concentrated exposure to fumes, gases, odors, and other pulmonary irritants. Tr. at 20. Judge Mackay's decision was affirmed by the Decision Review Board (DRB) on April 10, 2009. Tr. at 1-4.

Medical History

Mulkerron was born in November of 1976 and is currently thirty-three years old. She completed a Function Report – Adult Form on June 6, 2007, in which she stated that she had held various jobs since May of 1995: restaurant cashier, manicurist, office secretary, retail sales associate, and office receptionist. Tr. at 139. At trial, she related

2

having been involved in a serious motor vehicle accident in 2000, although the dates in the medical record conflict. Tr. at 36. Mulkerron's claimed impairments include bipolar disorder, panic attacks, seizures, and asthma. She does not claim any physical impairments. Tr. at 139. Her medications at the time of the hearing before the ALJ included ProAir (an inhalation aerosol) for her asthma, Trazodone (an antidepressant) for bipolar disorder and anxiety, and Zyrtec (an anti-histamine) for allergies and asthma. These were prescribed by her primary care physician, Dr. Christopher Smith. Tr. at 124. By the time of the administrative appeal, Mulkerron was also taking Clonidine as a sleep aid and Prozac for anxiety. These were prescribed by Susan Richardson, a nurse practitioner (NP). Tr. at 170. As of December 28, 2007, Mulkerron had begun to take amphetamine salts to treat attention deficit disorder (ADD). Tr. at 156.

On December 5, 2002, Mulkerron was admitted overnight to MetroWest Medical Center. According to Mulkerron, she collapsed while participating in an orientation program for new employees at Filene's. She brought herself to the emergency room, where she suffered a grand mal seizure. During the intake evaluation, Mulkerron described having been involved in a motor vehicle accident four years earlier (1998), in which she fractured her left femur, requiring surgical repair. She also complained of post-traumatic stress disorder (PTSD), attention deficit hyperactivity disorder (ADHD), asthma, and occasional alcohol and marijuana use. She denied any intravenous drug use. Her urine toxic screen, however, was positive for amphetamines, Tetrahydrocannabinol (THC), and opiates. Prior to her being discharged, Mulkerron and her mother were counseled regarding the severity of her condition. Tr. at 176-179.

In November of 2003, Mulkerron presented for an intake interview to Dr. Sandra Felder, a physician at Advocates Community Counseling (Advocates), an outpatient rehabilitation center for persons with mental illnesses, developmental disabilities, and substance abuse problems. During the interview, Mulkerron reported that she had used heroin for a year and a half, but had been in successful treatment for nine months. She stated that she had been involved in a car accident on October 13, 1998, in which she injured her left leg. Six months following the accident, she experienced an onset of panic attacks. She told Dr. Felder that she had attended college at North Adams State for one semester. Dr. Felder noted that Mulkerron's speech was pressured, her mood elevated, and her affect inappropriately loud. She concluded that Mulkerron suffered from bipolar disorder, PTSD, and opioid dependence. She recommended a change in medication to which Mulkerron objected and, as a result, she refused to treat further with Dr. Felder. Tr. at 180-185.

On August 28, 2006, Dr. Smith terminated Mulkerron as a patient, citing her persistent failure to keep scheduled appointments. Mulkerron had not kept an appointment since May 25, 2005. Mulkerron nonetheless returned to Dr. Smith's office on May 3, 2007, seeking relief for allergy symptoms. During that visit, Dr. Smith noted that Mulkerron was undergoing treatment for substance abuse. He believed that she was in need of psychiatric counseling. Tr. at 256-259. During a follow-up visit on December 6, 2007, Dr. Smith remarked that Mulkerron "as usual, talks without stopping, giving a semi-organized stream of ideas." Tr. at 254. He diagnosed her with mania and anxiety disorder, noting that she was "[u]nable to get a job. Good candidate for disability." Tr. at

255.

From 2005 to 2008, Mulkerron participated in a methadone treatment program at Spectrum Health Systems (Spectrum). The Spectrum treatment notes from January 12, 2007 through January 18, 2008, record various sessions with Lonka Nicholls, a Spectrum clinician. Tr. at 199-217, 261-302, 309-311, 314-342. Nicholls repeatedly urged Mulkerron to look for a job. On March 7, 2007, Mulkerron reported that she had been on a job interview and was hoping to be offered full-time employment. Tr. at 214. She iterated that desire during a May 30, 2007 appointment with Nicholls. Tr. at 203. Mulkerron continued, however, to miss appointments or to arrive late. Tr. at 201-202, 206, 209-211, 267-268, 278, 280, 295. A June 6, 2008 letter dictated by Nicholls for the file indicates that Mulkerron had successfully completed detoxification on January 15, 2008, and that she had remained free of illicit drugs since September of 2005. Tr. at 309.

At the request of the SSA, on September 7, 2007, Mulkerron presented to Dr. Felix Mayers, a DDS physician, for a consultative psychiatric evaluation. Dr. Mayers reported that Mulkerron had an "uncertain" diagnosis of bipolar disorder and a post-traumatic onset of panic attacks stemming from a motor vehicle accident in 2000. During the evaluation, Mulkerron reported that her panic attacks caused excruciating chest pains, shortness of breath, episodes of lightheadedness, and bouts of crying; that they lasted about fifteen minutes; and that they occurred frequently, especially when she was riding as a passenger in a car. By Mulkerron's account, the attacks had diminished over time, but had resumed with even greater frequency after she was involved in a second motor vehicle accident. Mulkerron stated that she would be able to follow workplace instructions (so long as she

5

was not having a panic attack), and that she did not foresee any difficulty relating to co-workers.  Tr. at 228-231.

On November 13, 2007, SSA sent Mulkerron for another DDS consultative psychiatric evaluation with Dr. Sharyn Lenhart.  Mulkerron told Dr. Lenhart that she had been free of drugs for three years, but was receiving treatment at Spectrum for Oxycontin abuse.  Mulkerron attributed her symptoms to a post-traumatic stress disorder caused by a recent motor vehicle accident that had triggered memories of a car accident  "occurring approximately five years ago" during which she was "in flight from her boyfriend." Tr. at 233.  Mulkerron recounted nightmares, panic attacks, and rapid shifts in mood, stating that she felt she could not work because of her acute anxiety level and her impaired concentration.  She described her daily activities as consisting of waking at 8:00 a.m., researching jobs and masters' degree programs on the computer, occasionally going to a job interview, attending weekly group therapy sessions at Spectrum, doing light housecleaning, watering plants, taking care of the family pet, assisting her mother with household errands, and eating dinner with her family.  She also reported taking English, Fashion Design, and Pharmacy Tech classes at Framingham State Community College and claimed to be a college graduate.

Dr. Lenhart noted that Mulkerron spoke with very pressured speech and moderate psychomotor hyperactivity – pulling at her hair, twisting her arm, and tapping her feet – throughout the interview.  She described Mulkerron's mood as anxious, noting that her computation, abstraction, and judgment skills were within normal limits, but that her concentration and short-term memory were slightly impaired. Tr. at 233-236.  Dr. Lenhart

6

diagnosed Mulkerron's primary symptomology as falling in the areas of anxiety and mood disturbance. She felt that Mulkerron might benefit from a mood stabilizer, stating that "[i]f [Mulkerron's] therapy were to focus on increased functioning and containment o[f] symptoms, she could probably begin to function better and perhaps work at least part-time." Tr. at 236.

Mulkerron received psychiatric treatment from Dr. Robert Berkowitz from February of 2004 to May of 2006. Dr. Berkowitz concluded that Mulkerron's problems were caused by substance abuse. After speaking with Mulkerron's mother, Dr. Berkowitz began to question Mulkerron's credibility. According to Dr. Berkowitz's November 20, 2007 report, Mulkerron refused to take medications other than Clonazepam (a muscle relaxant) and amphetamines. She also arrived late to every treatment session. When Dr. Berkowitz offered to meet jointly with Mulkerron and her mother, Mulkerron stopped treatment altogether. As a result, Dr. Berkowitz was unable to make a definitive diagnosis with respect to the presence of bipolar disorder. Nor was he able to assess Mulkerron's RFC. Tr. at 148.

On November 20, 2007, Dr. Eileen Lynch, a DDS physician, reviewed Mulkerron's records and completed a Psychiatric Review Technique Form in which she concluded that Mulkerron's only severe mental impairment was substance addiction, although she noted the apparent presence of a non-severe, medically determinable mood disorder. Tr. at 238-241. Dr. Lynch believed that Mulkerron's addiction would cause a marked restriction of daily activities and difficulties in maintaining concentration, persistence, and pace. Tr. at 248. She also noted many inconsistencies in Mulkerron's medical record, corroborated

by Dr. Berkowitz's determination that Mulkerron was not a truthful historian. Tr. at 250.[1]

On August 7, 2008, at the request of Mulkerron's attorney, Dr. Patricia Hanson, a private psychiatrist, completed a Mental Capacities Evaluation, diagnosing Mulkerron with PTSD and ADHD and noting symptoms that included loss of interest in daily life, feelings of guilt or worthlessness, generalized persistent anxiety, emotional withdrawal and isolation, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, and mood disturbance.[2] She rated Mulkerron's Global Assessment Functioning (GAF) at 55 and stated that she believed Mulkerron's mental impairments would cause her to be absent from work for more than four days a month.[3] Additionally, she indicated marked restrictions in activities of daily living and difficulties maintaining social functioning, with extreme limitations in maintaining concentration, persistence, and pace. Tr. at 313.

Administrative Hearing

The hearing on Mulkerron's benefits applications was convened by Judge Mackay on December 15, 2008. Tr. at 26-57. Mulkerron testified that she had not worked since

---

[1] On February 12, 2008, Mulkerron was notified by the Massachusetts Rehabilitation Commission that she had become eligible for employment services through the Statewide Employee Services Department in conjunction with Programs for People – Framingham. Tr. at 311.

[2] Dr. Hanson identified both diagnoses by their respective diagnostic codes, 309.81 and 314.9. See Diagnostic and Statistical Manual of Mental Impairments 810 (4th ed. 1994) (hereinafter, DSM-IV).

[3] A GAF in the range of 51 to 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

February of 2003, since leaving her job as a cosmetics salesperson at Filene's. Tr. at 30. Prior to working at Filene's, Mulkerron stated that she had been employed as a receptionist, pharmacy technician, paralegal, and hostess. Tr. at 30-34. She further testified that for approximately a year, Dr. Hanson had given her prescriptions for psychiatric medications (Prozac and Xanax). Tr. at 39, 41. Prior to seeing Dr. Hanson and an unidentified therapist, she testified to treatment sessions with NP Richardson and a therapist, Katie Kelly. Tr. at 40. Mulkerron also testified to treating with Dr. Berkowitz, but stated that his treatment sessions were too short (ten minutes) and therefore not helpful. Tr. at 40-41. Mulkerron's mother testified that Mulkerron's condition worsened under Dr. Berkowitz's care to the point where Mulkerron had stopped bathing and had taken to barricading herself in her bedroom. Tr. at 49.

VE Bier testified that Mulkerron's past work was at the semi-skilled level. ALJ Mackay presented Bier with a hypothetical claimant who had no physical exertional restrictions but was limited by: (1) an inability to understand, remember, or carry out complex or detailed instructions; (2) a need to avoid the general public; and (3) asthma triggers. Bier responded that under the limitations posed in the hypothetical, Mulkerron could not perform any of her past jobs, but could work in other jobs such as sales attendant, small parts assembler, package sealer, or security guard. When asked to assume that both Mulkerron and her mother were fully credible, VE Bier testified that Mulkerron could perform no meaningful work because of the "high number of episodes that seem unpredictable and last for up to two hours." Tr. at 53-55.

<u>The ALJ's Decision</u>

9

ALJ Mackay made the following salient written findings.

1. The claimant met the insured status requirements of the Social Security Act through March 31, 2008.

2. The claimant has not engaged in substantial gainful activity since January 15, 2003, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: Generalized Anxiety Disorder, Post-Traumatic Stress Disorder, Attention Deficit Disorder, Asthma.  (20 CFR 404.1571 *et seq.*, and 416.921 *et seq.*).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 404.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: frequently unable to understand, remember and carry out complex or detailed instructions, requires minimal contact with the general public and must avoid concentrated exposure to fumes, gases, odors and other pulmonary irritants.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 22, 1976 was 26 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569a, 404.1568(d), 416.969, 416.969a, and 416.968(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

12. Although the decision of the Federal Reviewing Official (FedRO) was not considered to be evidence, I agree with the conclusion on disability the FedRO made on the Title II and Title XVI claims. However, I do not agree with all of the substantive findings the FedRO made on these claims (20 CFR 405.370).

Tr. at 13-25.

## DISCUSSION

District court review of a disability determination by the Commissioner is of limited scope. The Commissioner's findings are conclusive if they are supported by substantial evidence. Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996). "Substantial evidence . . . means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence. . . . [The] question [is] not which side [the court] believe[s] is right, but whether [the ALJ] had substantial evidentiary grounds for a reasonable decision . . . ." Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). The Commissioner's findings "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

Disability determinations are to follow the "sequential step analysis" mandated by 20 C.F.R. § 404.1520. The ALJ must first determine whether the claimant was gainfully employed prior to the onset of the disabling condition. He must then determine whether the claimant suffers from a severe impairment limiting her ability to work. If the impairment

11

is the same as, or equal in its effect to, an impairment (or combination of impairments) listed in Appendix 1 of Subpart P of the regulations, the claimant is presumed disabled. If the impairment is not covered by Appendix 1, the fourth step of the analysis requires that the claimant prove that her disability is sufficiently serious to preclude a return to her former occupation. See Goodermote v. Sec'y of HHS, 690 F.2d 5, 6-7 (1st Cir. 1982). Only if she meets that burden is the Commissioner at the fifth step obligated to prove that there are other jobs in the national economy that she could nonetheless perform. See Gonzalez Perez v. Sec'y of Health, Educ. & Welfare, 572 F.2d 886, 888 (1st Cir. 1978).

The ALJ found at Step 1 and Step 2 of the analysis that Mulkerron had not been engaged in substantial gainful activity since January 15, 2003, and that she suffered from the severe impairments of anxiety disorder, PTSD, ADD, and asthma. At Step 3, however, the ALJ determined that these impairments, although severe, even in combination did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Thus, he proceeded to the fourth step of the analysis to determine whether Mulkerron had met her burden of proving that her impairments precluded her return to her former jobs. See Goodermote, 690 F.2d at 6-7.

Steps 4 and 5 of the analysis necessarily require an assessment of a claimant's RFC. See 20 C.F.R. § 404.1545(a)(5). To evaluate the RFC, the ALJ must follow a two-step process to: (1) determine whether the claimant has an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the complained of pain or other symptoms; and (2) if such an impairment exists, to

determine the extent to which it limits her ability to do basic work activities. This latter determination requires an evaluation of the intensity, persistence, and limiting effects of the claimant's pain or other symptoms. See id. § 404.1545(a)(2)-(3).

Following the prescribed RFC evaluation steps, the ALJ first determined that Mulkerron has a medically determinable impairment consistent with her symptoms. However, at the second step, he concluded that her statements regarding the intensity, persistence, and limiting effects of her reported symptoms were lacking in credibility. Tr. at 22. He determined that Mulkerron retained the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: (1) frequently unable to understand, remember, and carry out complex or detailed instructions; (2) requires minimal contact with the general public; and (3) must avoid concentrated exposure to fumes, gases, odors, and other pulmonary irritants. Tr. at 20.

At Step 4, the ALJ determined that Mulkerron had met her burden of proving that she is unable to perform any of her past relevant work. Tr. at 22-23. He then proceeded to Step 5, the determination of whether in light of her RFC, age, education, and work experience, Mulkerron retains the capacity to perform other appropriate and available work in the national economy. See Bowen v. City of New York, 476 U.S. 467, 470 (1986). Relying on the VE's testimony and his own evaluation of Mulkerron's credibility, the ALJ concluded that Mulkerron had acquired experiential work skills that were transferable to other suitable existing jobs. Tr. at 24. Mulkerron's age, he found, further supported this determination. Because Mulkerron was, and currently remains, a "younger person" (under age 50) for Social Security disability purposes, her age is not a factor that is considered

in assessing her ability to adjust to other work. See Oyola-Rosa v. Sec'y of HHS, No. 92-1810, 1992 WL 387678, at *4 n.5 (1st Cir. Dec. 30, 1992) (per curiam), citing 20 C.F.R. § 404.1563(c).[4]

On appeal, Mulkerron asserts that the ALJ erred in his assessment of her RFC, more particularly in his determination that her credibility was not supported by substantial evidence. She also argues that he improperly gave greater weight to the medical opinion of Dr. Lynch, the DDS examiner, than the opinion of one of her treating physicians, Dr. Hanson.

Credibility

The ALJ stated in his decision that "the claimant is a very poor historian[,] and [that he found] her to be *only partially credible*." Tr. at 22 (emphasis added). The ALJ must state specific reasons for finding a claimant not to be a credible witness. Da Rosa v. Sec'y of HHS, 803 F.2d 24, 26 (1st Cir. 1986). "[A] Court will not save [a] decision by inserting the basis for a finding where there was not substantial evidence to support it and no specific finding justifying it as a rational result." Rohrberg v. Apfel, 26 F. Supp. 2d 303, 310 (D. Mass. 1998). "In determining the severity of a claimant's pain, 'the absence of objective medical evidence supporting an individual's statements about the intensity and

---

[4]A claimant suffering from substance abuse is eligible for SSDI benefits if the claimant's addictive behavior is not material to a determination of disability. A claimant is eligible for benefits if her remaining physical and mental limitations would be disabling even if she stopped using drugs and alcohol. 20 C.F.R. § 404.1535(b)(1). See also Downs v. Apfel, 9 F. Supp. 2d 230, 234-235 (W.D.N.Y. 1998). Here, the ALJ concluded that Mulkerron's history of drug addiction was not "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).

14

persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility.'" Makuch v. Halter, 170 F. Supp. 2d 117, 127 (D. Mass. 2001), citing SSR 96-7p. If after evaluating the objective findings, the ALJ determines that the claimant's reports of pain are significantly greater than what could be reasonably anticipated from the objective evidence, the ALJ must consider other relevant information. Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986). Considerations capable of substantiating subjective complaints of pain include evidence of: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; and (5) any other factors relating to the claimant's functional limitations and restrictions due to pain. See 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii).

The principal reason given by the ALJ for questioning Mulkerron's truthfulness is the numerous internal inconsistencies in the medical record as well as the inconsistencies between the record and her own testimony. Tr. at 22. Mulkerron testified that the motor vehicle accident giving rise to her PTSD had occurred in 2000 while she was a passenger in the impacted vehicle. However, Dr. Felder reported that she had told her that the accident had occurred in October of 1998. Tr. at 182. Dr. Smith's records also state that the accident occurred in 1998, while Dr. Mayers' records indicate that the accident occurred in 2000. Tr. at 256, 228. Moreover, Mulkerron reported to Dr. Lenhart that she was "in flight from her boyfriend" when the accident occurred, implying that she was driving, and not a passenger. Tr. at 233.

15

The ALJ noted further inconsistencies regarding Mulkerron's claims of higher education. She testified at the hearing that she had received a Bachelor of Arts in Communication in 2000, but she told Dr. Felder in 2003 that she had only attended college for a semester. Tr. at 34, 183. Her Disability Report – Adult Form SSA-3368 and Dr. Lenhart's evaluation notes both report Mulkerron's claim that she had graduated from college. Tr. at 125, 235.

The ALJ appears to have given the greatest weight to the opinion of Dr. Berkowitz, the psychiatrist who treated Mulkerron from 2004 to 2006. Dr. Berkowitz completely discounted Mulkerron's credibility as a reporter, stating that she was "telling a very different story/lying about a lot of facts" and that he "never got a straight story from her." Tr. at 22, 148. The ALJ further concluded that Mulkerron had not been forthcoming about her substance abuse, admitting at the hearing only to the use of Oxycontin, while her medical records indicate a history of the use of various illicit drugs, including opiates. Tr. at 22, 182-183. Finally, the ALJ noted that during the period of her alleged disability, Mulkerron regularly reported to treating clinicians that she was seeking work and going on interviews. Tr. at 234.[5]

Mulkerron's argument at bottom is that despite the inconsistencies noted by the ALJ, he should have ignored them, and accepted her testimony at face value. It is not that

---

[5]Mulkerron argues (correctly) that the Social Security Act does not prohibit an individual who meets the definitional requirements of a disability from attempting to return to the workforce. Pl.'s Br. at 17-18. The Commissioner points out, however, that the ALJ emphasized the extent of Mulkerron's job seeking as well as her full schedule of daily activities as reinforcing his conclusion that Mulkerron retained the RFC to work in a semi-skilled job.

16

he could not have done so. However, the ALJ's determination of credibility, if sufficiently explained and supported by substantial evidence, as is the case here, is the final word. See Frustaglia v. Sec'y of HHS, 829 F.2d 192, 195 (1st Cir. 1987).

### Physicians' Opinions

Mulkerron first objects to the ALJ's analysis of DDS psychiatrist Dr. Lenhart's opinion. Pl.'s Br. at 18. According to Mulkerron, the ALJ cited Dr. Lenhart's determination that her concentration and memory were only mildly impaired, and then ignored the import of Dr. Lenhart's further opinion that "if [Mulkerron's] therapy were to focus on increased functioning and containment of symptoms, she could probably begin to function better *and perhaps work at least part-time*." Tr. at 236 (emphasis added). The ALJ, however, qualified his reliance on Dr. Lenhart's opinion by stating that it "fairly" supported his own findings relating to Mulkerron's RFC. Tr. at 23. As with the opinion of any expert, the ALJ was not in for a penny, in for a pound. He was free to rely on those aspects of Dr. Lenhart's opinion that were based on her observations as opposed to those that depended on Mulkerron's "subjective report of her mental impairments and of the functional limitations they imposed upon her." Comm'r Br. at 19. This is especially true given the ALJ's finding that Mulkerron was not a credible historian of her symptoms.

Mulkerron further argues that the ALJ improperly relied on the opinions of Dr. Lynch, a non-examining DDS physician, instead of those of her treating physician, Dr. Hanson (and to a lesser degree those of Dr. Lenhart). Under SSA regulations, an ALJ is directed to ordinarily give "more weight" to treating physicians' opinions, "since these sources are likely to be the medical professionals most able to provide a detailed,

17

longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(d)(2). However, the First Circuit "does not require ALJs to give greater weight to the opinions of treating physicians." Arroyo v. Sec'y of HHS, 932 F.2d 82, 89 (1st Cir. 1991). Rather, an ALJ is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista v. Sec'y of HHS, 826 F.2d 136, 144 (1st Cir. 1987). If the choice is supported by substantial evidence, the ALJ may prefer the opinion of a reviewing physician to that of the claimant's treating physician, as was the case with respect to Dr. Lynch. See Arroyo, 932 F.2d at 89.

The ALJ determined that the assessment of Dr. Lynch, who concluded that the medical evidence did not support Mulkerron's allegations, was consistent with his own evaluation of the record. Tr. at 23. He also found that Dr. Hanson's opinions, which were limited to a one-page form questionnaire, were inconsistent with the medical evidence. His choice as between the two opinions was a reasonable one that is fully supported by the evidence. It therefore will not be disturbed. See Arroyo, 932 F.2d at 89.

## ORDER

For the foregoing reasons, Mulkerron's motion to reverse or remand the decision of the Commissioner is DENIED. The Commissioner's cross-motion for an order of affirmance is ALLOWED. The Clerk will enter judgment accordingly and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE